**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

KATHERINE MARINARO and WHITNEY VAN DER DOES,

        Plaintiffs,

    v.

CSC GENERATION HOLDINGS, INC., OKL HOLDINGS, INC., ONE KINGS LANE, LLC and JUSTIN YOSHIMURA, in his individual and professional capacities,

        Defendants.

-----------------------------------------------------------------------X

Civil Action No.: 20-cv-06939 (PGG)

**AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiffs Katherine Marinaro and Whitney van der Does, by and through their attorneys, Wigdor LLP, as and for their Amended Complaint against CSC Generation Holdings, Inc., OKL Holdings, Inc., and One Kings Lane, LLC (together, the "Company," "One Kings Lane," or "CSC") and Justin Yoshimura (collectively, "Defendants"), hereby allege as follows:

**PRELIMINARY STATEMENT**

  1.  Justin Yoshimura, the Founder and CEO of CSC and the current Executive Chairman of One Kings Lane proudly boasts on his LinkedIn profile:

> [I]f you are easily offended (ie, by "Trader Jose" or by the fact that I do not have my "gender pronoun" in my title), it is probably best that we refrain from connecting.

  2.  Unfortunately, Mr. Yoshimura's intolerance does not stop there. Based on the allegations herein, upon information and belief, Mr. Yoshimura and his corporations also "refrain from connecting" with pregnant employees, in that they do everything in their control to avoid employing women who become pregnant.

3.     Plaintiffs Katherine Marinaro and Whitney van der Does – two One Kings Lane employees – experienced exactly that when CSC suddenly and unjustifiably denied them their maternity leave and maternity leave benefits only weeks before they were each due to give birth.

4.     Indeed, when Plaintiffs questioned CSC's unlawful behavior, CSC summarily and discriminatorily "furloughed" them under the false pretext of a COVID-19 related downsizing.

## NATURE OF THE CLAIMS

5.     Plaintiffs seek declaratory, injunctive and equitable relief, as well as monetary damages, to remedy the unlawful, discriminatory employment practices of Defendants, which violated the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), the New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

## ADMINISTRATIVE PREREQUISITES

6.     Plaintiffs have filed charges with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), as well as Title VII as amended by the Pregnancy Discrimination Act ("PDA").  As soon as the EEOC completes its investigation into Plaintiffs' complaints and issues a Notice of Right to Sue, Plaintiffs will seek leave to file a Second Amended Complaint to add Title VII and PDA claims against Defendants.

7.     Pursuant to NYCHRL § 8-502, Plaintiffs will serve a copy of this Amended Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.

8.    Accordingly, any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiffs' rights under the FMLA.

10.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district, Defendants maintained an office and conducted business at all relevant times in New York, New York.

## PARTIES

11.    Ms. Marinaro is Director of Integrated Marketing at CSC.  Ms. Marinaro is a resident of the State of New Jersey who, at all relevant times, was based in one of the Company's New York City offices and, at all relevant times, met the definition of an "employee" under all relevant statutes.

12.    Ms. van der Does is an Interior Designer at CSC.  Ms. van der Does is a resident of the State of New York who, at all relevant times, was based in one of the Company's New York City offices and, at all relevant times, met the definition of an "employee" under all relevant statutes.

13.    Defendant CSC is a domestic corporation with its principal office located at 251 Little Falls Drive, Wilmington, Delaware 19808.  At all times relevant herein, CSC maintained an office at 250 Hudson Street, Floor 11, New York, New York 10013.  At all times relevant herein, CSC was Plaintiffs' "employer" under all relevant statutes.

14.    Defendant OKL Holdings, Inc. is a domestic limited liability company with its

principal office located at 251 Little Falls Drive, Wilmington Delaware 19808.  At all times

relevant herein, OKL Holdings, Inc. maintained an office at 250 Hudson Street, Floor 11, New

York, New York 10013.  At all times relevant herein, One Kings Lane was Plaintiffs'

"employer" under all relevant statutes.

15.    Defendant One Kings Lane LLC is a domestic limited liability company with its

principal office located at 251 Little Falls Drive, Wilmington Delaware 19808.  At all times

relevant herein, One Kings Lane LLC maintained an office at 250 Hudson Street, Floor 11, New

York, New York 10013.  At all times relevant herein, One Kings Lane was Plaintiffs'

"employer" under all relevant statutes.

16.    Defendant Justin Yoshimura is the Founder, Chairman and Chief Executive

Officer of CSC and the Executive Chairman of One Kings Lane, LLC, and OKL Holdings, Inc.

At all times relevant herein, Defendant Yoshimura exercised decision-making authority over

Plaintiffs, including the ability to hire, fire, promote, or demote them, and such was Plaintiffs'

"employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

## I.    BACKGROUND

### A.    Katherine Marinaro Joins One King's Lane

17.    Ms. Marinaro is an integrated marketing leader with a comprehensive background

in retail, luxury and home marketing.

18.    Ms. Marinaro graduated from Wheaton College with a Bachelor of Arts in Studio

Arts and Psychology.

19.    Prior to joining One Kings Lane, Ms. Marinaro held multiple director-level

marketing positions, including serving as the Sitewide Marketing Director for Macy's, the

Director of Integrated Marketing for Gilt and the U.S. Marketing Director for Vestiaire Collective, where she was responsible for developing and managing marketing strategies across all channels, search engine marketing, online media, email, social media and search engine optimization.

20.    In late 2017, One Kings Lane contacted Ms. Marinaro through a recruiter and enticed her to leave Vestiaire Collective and join the Company.

21.    She went through numerous rounds of interviews, including meeting with the Company's then-President, Debbie Propst.

22.    Impressed by her background and potential, the Company offered Ms. Marinaro the position of Director of Integrated Marketing, which she accepted in February 2018.

23.    She was – by all accounts – extremely successful in her director position at the Company.

24.    Ms. Marinaro worked extremely long hours in the office and from home to manage a team of four direct reports who drastically increased revenue for the Company.

25.    By way of example only, when Ms. Marinaro commenced her employment in February 2018, she restructured all paid performance campaigns, which ultimately led to paid performance sales increasing by approximately 125%, thereby driving 17% of the Company's total business.

26.    To put that metric into perspective, the total business in 2018 drove $71.9 million in sales, which was a 22% increase compared to the previous year.

27.    Indeed, Ms. Marinaro's growth in the paid performance channel was so strong that the Company redirected approximately $1,800,000 in marketing resources from branding, magazine, catalog, and other partnerships and gave those funds to her to use in paid performance.

28.    Her superior marketing strategies continued throughout 2019, as she drove an additional 5% increase in paid performance sales.

29.    Ms. Marinaro's index performance was objectively well above the other areas in the Company.

30.    In the fall of 2019, Ms. Marinaro learned that she was pregnant with her second child.

31.    This was her first pregnancy at the Company, and she was optimistic that her pregnancy and upcoming maternity leave would not impact her upward career trajectory.

32.    In or around December 2019, the role of Senior Marketing Director became available at the Company.

33.    Given Ms. Marinaro's superb work as Marketing Director, she was the obvious candidate for this role.

34.    However, before she could even discuss the open position with her supervisor, Ms. Marinaro learned that another woman who had significantly less relevant experience, but no children, was selected for the promotion instead.

35.    Frustrated and confused by the Company's decision, she approached one of the decision makers at the Company and inquired why this other female employee was selected instead of her.

36.    Shockingly, Ms. Marinaro was told that this other female employee was selected for the promotion over her because the Company "**thought it made more sense for [the other**

female employee] than for [Ms. Marinaro] because work-life balance is not as much of a priority [the other female employee]."[1]

37.    This was completely illogical, especially because Ms. Marinaro consistently worked longer hours than the other female employee and repeatedly made the Company her first priority.

38.    The Company's decision to deny her the promotion because of its biased perception that she needed to focus on her family instead of her career simply because she had given birth or was pregnant with her second child clearly demonstrates unlawful discriminatory animus based on gender.

**B.    <u>Whitney van der Does Joins One Kings Lane</u>**

39.    Ms. van der Does is an experienced Marketing Editor with an extensive background in interior design and marketing.

40.    She graduated from Skidmore College with a Bachelor of Arts in Art History and Economics and also completed coursework in the Art of Merchandising and Buying through the Business of Fashion Education.

41.    Prior to joining One Kings Lane, she worked on the Store Design team for Barneys New York, where she sourced and created design schemes, including furniture and fixtures.  She then served as Barneys Public Relations and Special Events Coordinator, where she was responsible for the organization and execution of in-store events as well as attending external events as the brand's ambassador.

---

[1]    While Ms. Marinaro had not formally disclosed her second pregnancy when the Company made the decision to promote the other female employee, she was visibly pregnant at the time and upon information and belief, the relevant decision makers at the Company were aware that she was expecting her second child at the time the decision was made.

42.     In 2011, following Ms. van der Does's time at Barneys New York, she moved to Amsterdam, where she established herself as an independent Design Consultant, specializing in prop styling, fashion styling, and interior design.

43.     In 2015, Ms. van der Does decided to move back to New York.  Shortly after her move, she received a call from Alexander Reid, one of the founders of the studio of One Kings Lane.

44.     Mr. Reid aggressively recruited Ms. van der Does for the position of Interior Designer.

45.     Ms. van der Does was excited to join a budding company where she felt she could grow her career and accepted One Kings Lane's offer of employment in June 2015.

46.     Almost immediately after coming on board, Ms. van der Does began seeking out new responsibilities in addition to her role as an Interior Designer.

47.     By way of example, only a few months into her employment with the Company, Ms. van der Does took on One Kings Lane's "Buying Feedback Sessions," which involved extensive market research, including surveying fashion trends across the industry and reporting her findings to the Company's entire buying team.

48.     In or around 2017, in recognition of her hard work and success, Ms. van der Does was offered a new role as Site Marketing Merchandiser at the Company.

49.     In this role, Ms. van der Does utilized previous sales analysis and her knowledge of design trends to inform narrative choices and generate top performing digital sales events.

50.     In or around November 2017, the Company moved her into the role of Market Editor.

51.     As Market Editor, Ms. van der Does was responsible for creating reports and

presenting them to the entire organization, which the Company would then rely on for all sourcing and designing.

52.     Her supervisor, Jon Tutolo, repeatedly told Ms. van der Does that he believed Ms. van der Does was being grossly underpaid for her work and the value she brought to the Company.

53.     Indeed, Mr. Tutolo wrote to the Vice President of Marketing, Michael Krueger, in an effort to give Ms. van der Does a more prestigious job title and help increase her compensation.

54.     Despite these efforts, Ms. van der Does's compensation was barely increased over the course of five years of employment with the Company.

55.     In April 2019, One Kings Lane again changed Ms. van der Does's role and asked her to return to the studio side of the Company as a Designer.

56.     Ms. van der Does had enjoyed her work as a Market Editor and wanted to continue contributing to the Company, but also wanted a role that offered her stability and growth, so she was assured that this role would be a long-term opportunity for her to continue to develop her career with the Company.

57.     Ms. van der Does excelled in her new role, and she generated the most revenue of anyone on her team.

58.     In May 2019, acknowledging her superior work product and unmatched work ethic, Mr. Krueger – who supervised Ms. van der Does between November 2018 and April 2019 – gave her a very positive review.

59.     Then, in or around December 2019, Ms. van der Does announced that she was pregnant with her first child.

60.     Initially, the Company appeared supportive and assured her that she was eligible for the Company's maternity policy of 100% salary for 14 weeks.

61.     However, when CSC Generation purchased One Kings Lane on April 10, 2020, it immediately became abundantly clear that the Company's new management had no interest in keeping on a pregnant employee about to go on maternity leave.

## II.     CSC GENERATION DENIES PLAINTIFFS MATERNITY LEAVE AND FURLOUGHS PLAINTIFFS BECAUSE OF THEIR PREGNANCY STATUS[2]

62.     On April 10, 2020, CSC Generation announced its acquisition of One Kings Lane.

63.     Ms. Marinaro and Ms. van der Does were provided paperwork from the Company that stated they were now employed by "OKL Holdings, Inc. (a CSC Generation company)."

64.     Ms. Marinaro and Ms. van der Does also received a new employment agreement signed by CSC Generation's CEO and Founder, Justin Yoshimura.

65.     CSC, OKL Holdings, Inc. and One King's Lane LLC have both represented to Ms. Marinaro and Ms. van der Does that they are their employer.  Upon information and belief, they operate as a single and/or joint entity.

66.     Indicia of a single or joint employer relationship existing among CSC, OKL Holdings, Inc. and One King's Lane LLC, include: common management (including, but not limited to, Mr. Yoshimura), common human resources personnel, common ownership, common physical location and office space, and shared financial resources.  Moreover, Ms. Marinaro and Ms. van der Does were managed by CSC Generation executives, were subject to CSC

---

[2]     Upon information and belief, the only woman other than Ms. Marinaro and Ms. van der Does who was pregnant at One Kings Lane prior to CSC Generation's acquisition was recently constructively discharged.  Upon information and belief, this employee was informed that the Company would not allow her to take maternity leave and told her that the Company would furlough her indefinitely and replace her with another employee once she gave birth to her child.

Generation's policies and practices, received CSC Generation employee benefits and were told repeatedly that they are employees of CSC Generation and One Kings Lane.

67.     In addition, Ms. Marinaro and Ms. van der Does continued to work in the same offices, under their same managers, with the same coworkers, maintained their job responsibilities and operated under their job titles.

68.     For all intents and purposes, Ms. Marinaro and Ms. van der Does's jobs did not change because of CSC Generation's acquisition.

69.     Throughout the acquisition process, CSC Generation and OKL Holdings remained in regular contact with One Kings Lane regarding One Kings Lane employees, including Ms. Marinaro and Ms. van der Does, with regard to, by way of example only, the employees' backgrounds, qualifications, and performance.

70.     At the time of the acquisition, Ms. Marinaro and Ms. van der Does were well into the third trimester of their pregnancy.

71.     Immediately after the acquisition, CSC Generation began making unlawful changes to the Company's policies and practices with respect to employees, including, by way of example only, taking the unfounded position that their eligibility for protection under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq*., was cut off by the change in corporate structure.

72.     Also by way of example only, CSC Generation announced that it would only provide up to three days of paid sick leave to its employees.  This, of course, is in direct violation of the New York City Earned Sick Time Act, N.Y.C. Admin. Code §§ 20-911 *et seq*., which entitles New York City employees to five days of paid sick leave.

73.     It was only after employees complained that their rights were being violated that CSC Generation provided the additional two days.

74.     These changes underscore that CSC Generation is only focused on maximizing its profits and not concerned with the rights of its employees.

75.     Thus, CSC Generation is willing to act in flagrant disregard of the law to avoid giving its employees their entitled leave.

76.     Deeply concerned, Ms. van der Does called Human Resources to confirm that her eligibility for maternity leave would not be affected by the change.

77.     Ms. van der Does spoke with Human Resources Manager, Jessica Taylor.

78.     Ms. Taylor assured Ms. van der Does that CSC Generation would honor One Kings Lane's maternity policy and that she would be able to take her paid leave as planned.

79.     Ms. Marinaro also reached out to Ms. Taylor and requested confirmation that she would be able to apply her already accrued paid time off to her maternity leave irrespective of the corporate structure, which Ms. Taylor confirmed in writing.

80.     Unfortunately, CSC Generation failed to live up to its promise.

81.     One week after the acquisition, and without warning, CSC Generation "furloughed" Ms. Marinaro and Ms. van der Does – only weeks before they each were going to go on their respective maternity leaves.

82.     Moreover, CSC Generation failed to provide Ms. Marinaro or Ms. van der Does a return to work date, making it clear that this "furlough" was not temporary but a decision to permanently terminate two female employees because of their pregnancies and expected maternity leaves.

83.    While Ms. Marinaro and Ms. van der Does were not the only CSC Generation employees to be furloughed/terminated, their selection and the manner with which they were furloughed makes clear that CSC Generation's decision to end their employment was motivated by unlawful discriminatory animus and did not constitute a legitimate business reason.

84.    By way of example only, Ms. Marinaro and Ms. van der Does were both selected for furlough instead of their lower performing and lower earning counterparts.

85.    Ms. Marinaro was furloughed, whereas the other female employee was not, even though Ms. Marinaro did significantly more work than her, and the other employee had a known history of taking credit both for work she had not done and work she had failed to do in a timely manner.[3]

86.    Ms. van der Does was also inexplicably chosen for furlough instead of her coworkers, even though her productivity and revenue are unequivocally higher than the other non-pregnant members of her team.

87.    After they learned they was being furloughed, they continued to reach out to CSC Generation to ascertain whether they would still be able to take advantage of their paid maternity leave.

88.    Ms. Marinaro was told by Human Resources Manager Ms. Taylor that when Ms. Taylor asked CSC Generation's executive body whether it would honor its promise to pay the maternity leave, she was "**laughed at**" – as if denying a woman paid leave to care for her child is even remotely humorous – and was told that the Company would not pay for maternity leave period.

---

[3]    Ms. Marinaro was also not consulted on the decision of who from her team to terminate and/or furlough, which is further evidence that the Company's decision to furlough her was really a decision to terminate her.

89.    Ms. Marinaro was also told that she was not eligible for short term disability leave, because her pregnancy would be considered "a pre-existing condition," and Ms. van der Does was also told that she was not entitled to any maternity leave or maternity benefits.

90.    Ms. Marinaro and Ms. van der Does were also told they were not entitled to FMLA protections because they were new employees of CSC, and so they did not meet the minimum number of hours required to be eligible for FMLA, even though both women had been with the Company for years, and CSC and OKL Holdings, as One Kings Lane's successors-in-interest, were required to treat their employment as continuous.

91.    Ms. Taylor followed up and told Ms. Marinaro and Ms. van der Does that if they wanted to file a claim for unemployment benefits, the Company would not contest their claim.

92.    Again, CSC Generation was willing to disregard New York State's disability leave and unemployment insurance laws to avoid paying its pregnant employees their entitled benefits.

93.    The following week, on April 24, 2020, Ms. Taylor held a meeting to get employees' feedback on CSC Generation's new policies.

94.    Ms. Marinaro attended that meeting and said in the meeting that CSC Generation's new policy "doesn't seem legal."

95.    Ms. Taylor failed to address her concern or conduct any investigation.

96.    On or around May 14, 2020, Ms. Marinaro and Ms. van der Does complained of gender and pregnancy discrimination through counsel.

97.    Immediately after making her complaint of discrimination, Ms. Marinaro's and Ms. van der Does's access to their CSC Generation e-mail account was terminated – which is consistent with a permanent termination.

98.    Shortly thereafter, Mr. Yoshimura addressed all current One Kings Lane employees in a "town hall."  All of the furloughed employees were excluded from this town hall.

99.    Upon information and belief, Mr. Yoshimura informed the non-furloughed One Kings Lane employees that no furloughed employees would be returning to work.

100.    Also upon information and belief, Mr. Yoshimura was involved in deciding which employees to furlough and which employees to reinstate.

101.    On May 28, 2020, Ms. van der Does gave birth to her daughter, and on June 20, 2020, Ms. Marinaro gave birth to her son.

102.    At this time, they both remained out of work and without any salary or maternity leave benefits.

103.    Only after Ms. Marinaro and Ms. van der Does sent a complaint of discrimination through counsel did CSC Generation offer their reinstatement.

104.    Belatedly, in a transparent effort to cover its tracks, on Saturday, June 27, 2020, CSC Generation demanded that Ms. van der Does return to work that coming Monday, June 29, and on Wednesday, July 7, 2020, CSC Generation demanded that Ms. Marinaro return to work the very next day – i.e., Thursday, July 8 – even though they each had recently given birth to their children and needed time off for maternity leave.

105.    At the time CSC contacted Ms. Marinaro and Ms. van der Does about returning to work, there was no mention of maternity leave or maternity benefits.  CSC expected them to return to work within days-notice, only weeks after giving birth.

106.    Upon information and belief, CSC Generation only offered their reinstatement because it believed they would file a lawsuit for discrimination and retaliation, and it wanted to reduce the amount of economic damages they could be entitled to in court.

107.    Upon information and belief, other than Ms. Marinaro and Ms. van der Does, only three other employees were reinstated to their full-time positions at One Kings Lane.

108.    Upon information and belief, the maternity benefits CSC offered upon Ms. Marinaro and Ms. van der Does's reinstatement were substantially inferior to those they had before they were terminated.  The only thing that changed was their complaint of pregnancy discrimination.  Therefore, CSC has unlawfully retaliated against them.

109.    Upon information and belief, CSC has not conducted any investigation or responded to Ms. Marinaro's and Ms. van der Does's complaints of discrimination in any meaningful way.

110.    CSC belatedly provided them information concerning their maternity leave benefits.

111.    When Ms. Marinaro and Ms. van der Does finally did receive information concerning their benefits, CSC reduced the number of weeks of leave that they were entitled to as well as diminished the amount they were to be paid while on maternity leave.

112.    Ms. Marinaro and Ms. van der Does were also denied much of their paid accrued vacation time that they were saving for their maternity leave.

113.    After months of pleading the Company for their federal and state maternity leave benefits, the Company finally provided Ms. Marinaro and Ms. van der Does with paperwork to apply for paid family leave under New York State's paid family leave program.

114.    One month after Ms. Marinaro and Ms. van der Does applied for paid family leave, Defendants had failed to pay them any of their maternity benefits.

115.    Thus, the Company has unlawfully left Ms. Marinaro and Ms. van der Does to care for their family and their newborn children without any employment income, which has resulted in lost earnings during this crucial and vulnerable part of their lives.

116.    On October 6, 2020, Ms. van der Does returned to work.  Ms. van der Does was not restored to an equivalent position.  On October 18, 2020, because she was not restored to an equivalent position, and because of the discriminatory and retaliatory conduct that she faced, Ms. van der Does was constructively discharged.

117.    Ms. Marinaro returned to work on October 19, 2020.  Since her return to work, it is clear that she has not been restored to her original job or even an equivalent one.

118.    Ms. Marinaro has been given job responsibilities that are a far cry from the marketing work she did prior to the furlough.  Since her return, her workload has precipitously decreased, and her responsibilities seldom relate to marketing.

119.    Her colleagues, many of whom are in the tech department, have expressed confusion as to why Ms. Marinaro has been assigned to work with them, rather than with the marketing team.

120.    Further demonstrating that Ms. Marinaro has not been restored to an equivalent position, Ms. Marinaro's new supervisor, Preetam Shingavi, does not work in marketing and has never been involved in marketing.  When Ms. Marinaro inquires with Mr. Shingavi as to what happened to her pre-furlough responsibilities, Mr. Shingavi refuses to give Ms. Marinaro a straight answer.

121.    Ms. Marinaro's supervisors frequently and needlessly berate her.

122.    These are telltale signs that the Company intended to permanently terminate Ms. Marinaro and never intended her to return from furlough.

**FIRST CAUSE OF ACTION**
**(FLMA Interference in Violation of the FMLA)**
*Against Defendant CSC Generation and Defendant OKL Holdings*

123.    Plaintiffs repeat, reiterate and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

124.    At all times relevant herein, Defendants CSC Generation and OKL Holdings were "covered employer[s]" within the meaning of the FMLA.  They employ 100 or more employees in at least 20 calendar weeks within a 75-mile radius of the Company.

125.    Upon information and belief, at all times relevant herein, Plaintiffs were either actually or potentially eligible as a "covered employee" within the meaning of the FMLA because they worked full-time at Defendants before they were unlawfully discriminated against/and or retaliated against by the Company.

126.    By the actions described above, among others, Defendants CSC Generation and OKL Holdings violated the FMLA by unlawfully interfering with, restraining, or denying the exercise of Plaintiffs' rights by, *inter alia*, furloughing and/or terminating Plaintiffs which thereby interfered with their ability to utilize their FMLA protected rights.

127.    As a direct and proximate result of their unlawful conduct in violation of the FMLA, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

128.    Plaintiffs are entitled to an award of liquidated damages, as Defendants CSC Generation and OKL Holdings violated the FMLA, and such conduct was not in good faith and there was not a reasonable basis for believing that such conduct was not a violation of the FMLA.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the FMLA)
### *Against Defendant CSC Generation and Defendant OKL Holdings*

129.    Plaintiffs repeat, reiterate and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

130.    By the actions described above, among others, Defendants CSC Generation and OKL Holdings have retaliated against Plaintiffs for availing themselves of the rights and benefits of the FMLA.

131.    As a direct and proximate result of their unlawful conduct in violation of the FMLA, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

132.    Plaintiffs are entitled to an award of liquidated damages, as Defendants CSC Generation and OKL Holdings violated the FMLA, and such conduct was not in good faith and there was not a reasonable basis for believing that such conduct was not a violation of the FMLA.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### *Against All Defendants*

133.    Plaintiffs hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

134.    By the actions described above, among others, Defendants discriminated against Plaintiffs on the basis of their gender and/or pregnancy and/or motherhood status in violation of the NYSHRL by denying Plaintiffs the same terms and conditions of employment available to

others based on their gender and/or pregnancy and/or motherhood status, including, but not limited to, denying them terms and conditions of their employment and/or terminating them.

135.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages, to the greatest extent permitted under law.

136.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYSHRL for which Plaintiffs are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
***Against Defendant CSC Generation, Defendant OKL Holdings, and Defendant Yoshimura***

137.    Plaintiffs hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

138.    By the actions described above, among others, Defendants CSC Generation, OKL Holdings and Yoshimura have retaliated against Plaintiffs by, *inter alia*, terminating their employment and denying them terms and conditions of their employment in retaliation for their protected activity.

139.    As a direct and proximate result of their unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continues to suffer harm for which they are entitled to an award of damages, to the greatest extent permitted by law, in addition to reasonable attorneys' fees and costs.

140.    Their unlawful and discriminatory actions constitute knowing, malicious, willful, wanton, and reckless violations of the NYSHRL for which Plaintiffs are entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting Violation of the NYSHRL)
### *Against Defendant One Kings Lane LLC and Defendant Yoshimura*

141.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

142.    Defendants One Kings Lane and Yoshimura knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiffs were subjected in violation of the NYSHRL.

143.    As a direct and proximate result of Defendants One Kings Lane's and Yoshimura's unlawful aiding and abetting in violation of NYSHRL, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

144.    Defendants One Kings Lane's and Yoshimura's unlawful aiding and abetting constitutes malicious, willful, wanton, and reckless violations of the NYSHRL for which Plaintiffs are entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### *Against All Defendants*

145.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

146.    By the actions described above, among others, Defendants discriminated against Plaintiffs on the basis of their gender and/or pregnancy and/or motherhood status in violation of the NYCHRL by denying Plaintiffs the same terms and conditions of employment available to others based on their gender and/or pregnancy and/or motherhood status, including, but not limited to, denying them terms and conditions of their employment and/or terminating them.

21

147.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages, to the greatest extent permitted under law.

148.     Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against Defendant CSC Generation, Defendant OKL Holdings, Inc. and Defendant Yoshimura***

149.     Plaintiffs hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

150.     By the actions described above, among others, Defendants CSC Generation, OKL Holdings, Inc. and Yoshimura have retaliated against Plaintiffs by, *inter alia*, terminating their employment and denying them terms and conditions of their employment in retaliation for their protected activity.

151.     As a direct and proximate result of their unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages, to the greatest extent permitted by law, in addition to reasonable attorneys' fees and costs.

152.     Defendants' unlawful and discriminatory actions constitute knowing, malicious, willful, wanton, and reckless violations of the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Violation of the NYCHRL)
### *Against Defendant One Kings Lane LLC and Defendant Yoshimura*

153.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

154.    Defendants One Kings Lane and Yoshimura knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiffs were subjected in violation of the NYSHRL.

155.    As a direct and proximate result of their unlawful aiding and abetting in violation of NYSHRL, Plaintiffs have suffered and continues to suffer harm for which they are entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

156.    Defendants One Kings Lane's and Yoshimura's unlawful aiding and abetting constitutes malicious, willful, wanton, and reckless violations of the NYSHRL for which Plaintiffs are entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein and any further retaliation and/or tortious conduct;

C.      An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all past and future monetary and/or economic damages;

D.      An award of liquidated damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for the intentional deprivation of wages or benefits;

E.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including, but not limited to, compensation for their emotional distress and physical illness;

F.      An award of punitive damages against Defendants, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiffs have incurred in this action, including, but not limited to, expert witness fees, as well Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  November 9, 2020
        New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
        Valdi Licul
        David A. Schmutzer

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
vlicul@wigdorlaw.com
dschmutzer@wigdorlaw.com

*Counsel for Plaintiffs*